UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

WANDA SINCLAIR,

                                    Plaintiff,

           -against-

THE CITY OF NEW YORK,

                                    Defendant.

------------------------------------------------------------------------ x

**NOTICE OF MOTION FOR SUMMARY JUDGMENT**

06 Civ. 0141 (WHP)

       **PLEASE TAKE NOTICE**, that upon the Declaration of Joshua Fay, dated November 20, 2006, and the declarations, exhibits and deposition testimony annexed thereto, defendant's Statement Pursuant To Rule 56.1 of the Local Civil Rules of the Southern District of New York, dated November 20, 2006, and defendant's Memorandum of Law In Support Of Its Motion For Summary Judgment, dated November 20, 2006, and all prior papers and proceedings had herein, defendant will move this Court, before the Honorable William H. Pauley, United States District Judge, Southern District of New York, at the United States District Courthouse, 500 Pearl Street, New York, New York, on a date and time to be set by the Court, for an order, pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting summary judgment in favor of defendants on all claims alleged by plaintiff, and for such other and further relief as may be just, proper and equitable.

**PLEASE TAKE FURTHER NOTICE**, that, pursuant to the order of the Honorable William H. Pauley, United States District Judge, dated November 14, 2006, papers in opposition to defendant's motion for summary judgment, if any, are to be served by December 18, 2006, and any reply is to be served by December 28, 2006.

Dated:   New York, New York
         November 20, 2006

                          **MICHAEL A. CARDOZO**
                          Corporation Counsel of the
                           City of New York
                          Attorney for Defendant
                          100 Church Street, Room 2-123
                          New York, New York 10007-2601
                          (212) 788-8699

By: _/s/ Joshua R. Fay_____
     Joshua R. Fay (JF-9397)
     Assistant Corporation Counsel

To:   **PAMELA D. HAYES, ESQ.**
      Attorney for Plaintiff
      200 West 57th Street, Suite 900
      New York, New York 10019

06 Civ. 0141 (WHP)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WANDA SINCLAIR,

                          Plaintiff,

-against-

THE CITY OF NEW YORK,

                          Defendant.

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**MICHAEL A. CARDOZO**
*Corporation Counsel of the City of New York*
Attorney for Defendant
100 Church Street, Room 2-123
New York, New York 10007-2601

Of Counsel:   Joshua R. Fay
Tel No.:   (212) 788-8699

NYCLIS No.: 06 LE 000067

*Service of which is hereby acknowledged:*

*New York, New York*  Dated: ................

Signed: ................

Attorney for: ................

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x

WANDA SINCLAIR,

                                      Plaintiff,

          -against-

THE CITY OF NEW YORK,

                                      Defendant.

**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1**

06 Civ. 0141 (WHP)

------------------------------------------------------------------- x

Pursuant to Local Rule 56.1 of the Civil Rules of this Court, defendant City of New York (hereinafter "City" or "defendant") submits its statement of material facts as to which there is no genuine issue to be tried:

1. Plaintiff, Wanda Sinclair (hereinafter referred to as "Sinclair" or "plaintiff"), a 52-year-old African-American female, brings this action against the City pursuant to 42 U.S.C.A. § 1981, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, 29 U.S.C.A. §§ 621-634, and the City Human Rights Laws, alleging that Defendant discriminated against her on the basis of her race, gender and age by failing to promote her to two open positions within the New York City Department of Housing Preservation and Development. See Compl., Exhibit "A."[1] Specifically, with respect to her failure to promote claims, plaintiff alleges that she was the most qualified

---

[1] References to all exhibits are to those annexed to the Declaration of Joshua Fay, dated November 20, 2006, submitted herewith in support of the defendant's motion for summary judgment ("Fay Decl.").

candidate for the position of (1) Associate City Planner – Level 2, and (2) Administrative Project Director M-2, and that defendant failed or refused to hire plaintiff to either position because of her race, gender and age or because of retaliatory animus. See Exhibit "A."

2. Plaintiff also contends that she was subjected to a hostile work environment and that defendant retaliated against her because she had filed a grievance regarding her job in 2001, and a charge of discrimination with the EEOC in 2005. See id.

A.  **Plaintiff's Work Experience Within HPD**

3. In 1976, plaintiff received a Bachelor of Arts degree in Sociology from Medgar Evers College. See Exhibit "B" at 8:25-9:4; see also Exhibit "C." Plaintiff does not hold a graduate degree. See Exhibit "C."

4. Plaintiff began her employment with the New York City Department of Housing Preservation and Development ("HPD") as a Real Estate Manager in 1978. See Exhibit "B" at 26:14-24. She worked in this position until 1982. Id. at 27:10. In this position, plaintiff acted as a property manager for properties that the City had acquired through tax forfeiture. See Exhibit "B" at 27:1-7.

5. In 1982, plaintiff was promoted off a civil-service list to the position of associate real property manager. See Exhibit "B" at 27:12-16. In that position, her responsibilities included the supervision of six to eight real estate managers. Id. at 27:15-16.

6. In 1988, plaintiff passed a civil-service test for the title of Assistant Project Development Coordinator and was promoted to the position of unit chief in the Neighborhood Ownership Works program. See Exhibit "B" at 31:18-32:22. This position was under the Division of Alternative Management Program ("DAMP"). Id. at 32:18-22.

7. As unit chief in the Neighborhood Ownership Works program, plaintiff supervised project managers to ensure that City-owned properties intended for sale to for-profit developers were properly rehabilitated prior to sale. See Exhibit "B" at 32:23-33:3.

8. In 1992, plaintiff was promoted to deputy director of the Neighborhood Ownership Works program. See Exhibit "B" at 33:15-17. In that position, plaintiff supervised six project managers, developed procedures for relocating the tenants occupying buildings intended for sale, and coordinated property inspections involving property-management staff and technical staff. See id. at 34:17-24; see also Exhibit "C."

9. In 1996, the Neighborhood Ownership Works program was phased out and plaintiff's position was consolidated into a newly developed unit, the Neighborhood Redevelopment Program. See Exhibit "B" at 38:2-7. She retained her title of deputy director in the Neighborhood Redevelopment Program and her duties changed to include the preparation of city-owned properties for development by not-for profit organizations, ensuring compliance with the requirements of the City's Tax Credit Program, and making sure that these organizations met the requirements necessary to get approval to convert City-owned properties for development by not-for-profit organizations. See Exhibit "B" at 38:15-24; see also id. 41:1-3.

10. Plaintiff continued to work as deputy director of the Neighborhood Redevelopment Program until 2001. In May 2001, she took a worker's-compensation leave following a car accident, returning to work in September 2001. See Exhibit "B" at 42:3-22. Prior to returning to work, plaintiff was informed that the Neighborhood Redevelopment Program had been reorganized and that she would be placed in a different job within the agency. See id. at 42:20-22.

3

11. Upon returning to work, plaintiff testified in her deposition that she was not given any job responsibilities immediately and that the transfer to a new position she had been promised did not take effect. See Exhibit "B" at 43:17-24. Plaintiff instituted a grievance in order to resolve the issue of her reassignment. Id. at 43:25-44:2.

12. Plaintiff did not allege in her grievance that the alleged failure to properly reassign her was discriminatory. See Exhibit "B" at 86:3-8.

13. Plaintiff testified that the first position HPD offered her following her filing of the grievance was not appealing to her because it did not offer her the opportunity for professional growth that she sought. See Exhibit "B" at 44:13-19. Specifically, plaintiff testified that she sought experience in the financial aspects of property development, as her prior experience had been limited mainly to the construction aspects of property development. Id.

14. Plaintiff requested a position within HPD's Development Unit. Plaintiff testified that HPD made an effort to accommodate her request, and she was interviewed for two positions in that Unit. See Exhibit "B" at 48:11-24. She was offered both positions. Id.

15. Plaintiff accepted a position in the Tax Credit and Compliance Unit, within HPD's Development Division in November 2001. See Exhibit "B" at 44:20-45:7. See also Exhibit "C." Plaintiff settled her grievance when she accepted this position in HPD's Development Unit. See Exhibit "B" at 52:1-10. Plaintiff testified that she was pleased to be placed in the Development Unit because the position afforded her the "opportunity to be exposed to and learn the financial aspects of the construction industry or the housing development industry." Id. at 45:8-15.

4

16. While working in the Tax Credit and Compliance Unit, plaintiff was responsible for providing information and guidance to developers on issues regarding compliance with several tax-credit programs, and working with the HPD unit responsible for inspecting apartments to ensure their compliance with the appropriate regulations and guidelines. See Exhibit "B" at 45:18-46:3; see also Exhibit "C." Plaintiff held this position until November 2003. See Exhibit "B" at 46:15-18.

17. Plaintiff testified that she became disappointed in the position with the Tax Credit and Compliance Unit, because she had hoped to get the opportunity to learn the financial aspects of housing development, but in fact did not get the training or experience in that area, largely because scheduling housing inspections and complying with inspection requirements proved to be such a large part of the job. See Exhibit "B" at 47:7-48:8.

18. In or about March 2003, plaintiff contacted her union and complained that the duties she was performing didn't match her civil service title. Her union negotiated with HPD and HPD agreed to place plaintiff in a different job. See Exhibit "B" at 55:20-56:17. Plaintiff did not allege that the placement in these jobs was discriminatory. See Exhibit "B" at 86:3-8.

19. Thereafter, plaintiff was transferred to a position with the Small Buildings Loan Program. See Exhibit "B" at 57:2-3. Plaintiff testified that she was satisfied with this transfer. See id. at 58:7-9.

20. Following this transfer, plaintiff became a mortgage officer for the Small Buildings Loan Program. See Exhibit "B" at 64:7-9. This program is also under HPD's Development Division. See id. at 64:13-19.

21. Plaintiff has held this job since April 2003. See Exhibit "C." As a mortgage officer with the Small Buildings Loan Program, plaintiff is responsible for reviewing loan applications and making determinations as to whether borrowers are eligible for a low-interest loan provided by the program. See Exhibit "B" at 64:20-24. The lending institutions with whom she works in the Small Buildings Loan Program are the neighborhood home services program and the community preservations services, both of whom lend money at lower-than-market rates. See id. at 64:24-65:2. Neither of these institutions are banks. Id.

22. Plaintiff testified that she would like to gain experience in new construction, which she currently lacks. See Exhibit "B" at 66:19-21. She further testified that she has no experience with selecting developers nor any experience in city planning, zoning analysis, and site clearance. Id. at 67:7-69:3.

23. Plaintiff also testified that she does not have experience acting directly as a liaison between various governmental bodies. See id. at 67:17-70:21.

**B.     Plaintiff's Allegations of Discrimination Based on Age, Race, and Gender.**

**(a) Plaintiff Applies for the Associate Planner Level 2 Position.**

24. On July 12, 2004, the Office of Development/Division of Homeownership posted a job-vacancy notice for the civil-service title of Associate City Planner, Level 2. The successful candidate would become the Deputy Director of the New Foundations Program in the Division of Homeownership. See Exhibit "D."

25. The posting for the Deputy Director position noted that the successful applicant would supervise staff, perform administrative functions, and assist in development of plans, liaison with developers, lenders, not-for-profit organizations and governmental agencies, and perform high-level activities related to site clearance, design, environmental and construction monitoring issues. See id.

6

26. The posting for this position listed the minimum requirements to include a Baccalaureate degree from an accredited college and four years of satisfactory experience in city planning. See id.

27. The posting further stated that "[g]raduate work leading to an advanced degree in city planning, urban design, architecture, landscape architecture, transportation engineering, or related fields may be substituted of up to two years of experience on the basis of 30 semester credits for one year of experience." See id.

28. The posting dates were from July 12, 2004 through July 30, 2004, and the posting indicated that interested parties should submit resume and cover letter to Christopher Allred at HPD. See id.

29. Plaintiff first saw the posting for Associate City Planner Level 2 on HPD's website in July, 2004. See Exhibit "B" at 71:2-13. In response to the posting, plaintiff submitted her resume and a cover letter on July 29, 2004. See Exhibit "B" at 73:10-13. See also Exhibit "C."

(b)  **The New Foundations Program at HPD**

30. The New Foundations program provides opportunities for developers of one to four family housing, cooperatives, and condominiums, to build moderate and middle income housing on land purchased from the City. The sites in question are not always under the control of HPD, and HPD must work with other City and governmental agencies to procure them and prepare them for development. Sites must be analyzed for zoning restrictions and other potential constraints such as environmental concerns, to insure that they can be put to the best possible use, maximize the number of units that can be developed on each site, and minimize the time needed for appropriate approvals from concerned

governmental agencies. See the Declaration of David Jackson sworn to November 20, 2006 ("Jackson Decl."), and annexed to the Fay Decl, at ¶ 5. New Foundations is also responsible for negotiations between developers, lenders, and contractors. The skills related to site selections, zoning issues, intergovernmental negotiations to procure sites, and project negotiations are all related to city planning work. See Jackson Decl. at ¶ 5.

31. The work of the Office of Development in finding properties for use in developments such as those sponsored by New Foundations is different from that of many other divisions within HPD and the majority of HPD's housing specialists. Specifically, many of the other divisions of HPD handle the management, stabilization, and disposal of occupied and vacant properties, acquired by the City through tax foreclosure proceedings. See Jackson Decl. at ¶ 6.

32. The property sites handled by the New Foundations Program are the ones most challenging to develop, requiring sophisticated zoning analysis, detailed market analysis, and complex financial underwriting. See Jackson Decl. at ¶ 8.

33. Given the nature of the work of the New Foundations program, HPD intended to find a high level urban planner to serve as Deputy Director in New Foundations; a person who had training and experience in developing such difficult properties. See Jackson Decl. at ¶ 9.

34. Plaintiff alleges that Eric Enderlin, who she contends was less qualified than plaintiff, was awarded the position of Associate City Planner Level 2. See Compl., Exhibit "A" at ¶ 6.

35. Plaintiff testified that she believed she had been discriminated against because she was not interviewed for the position of Associate City Planner Level 2. See Exhibit "B" at 79:1-5.

36. Plaintiff does not allege that anyone else who submitted a resume in response to the posting for Associate City Planner Level 2 was interviewed. See Compl., Exhibit "A."

### (c) Because of Eric Enderlin's Work Experience and Qualifications, He Was Hired for the Position of Associate City Planner Level 2.

37. In the Spring of 2004, David Jackson was Assistant Commissioner of Development at HPD and was in charge of deciding who to hire for the position of Associate City Planner Level 2. See Jackson Decl. at ¶ 1, 13.

38. David Jackson is a 48 year-old African American male. See Jackson Decl.

39. Plaintiff testified that she knew David Jackson because they had worked on the same floor while she was the Deputy Director of the Neighborhood Redevelopment Program. See Exhibit "B" at 79:25-80:25. She knew that he was the Assistant Commissioner for the Division of Homeownership in July 2004. Id. at 80:23-25; see also Exhibit "B" at 82:20-25. Plaintiff did not allege that Assistant Commissioner Jackson made any offensive remarks to her or otherwise indicated that he had any bias against African Americans, women, or persons over forty. See Exhibit "B" at 83:1-9.

40. Assistant Commissioner Jackson knew Eric Enderlin from Enderlin's employment with the New York City Housing Authority ("NYCHA") as an Assistant Director with the Strategic Planning Group. See Jackson Decl. at ¶ 10. Assistant Commissioner Jackson believed Mr. Enderlin had the skills that were needed in the New Foundations unit and encouraged him to apply for the Deputy Director position. In fact,

9

Assistant Commissioner Jackson believed Enderlin to be uniquely qualified for the position, because, not only did he have a Masters Degree in Urban Planning and Policy, he also had specific experience with pricing of development costs for new construction, as well as significant experience with financial underwriting and financial modeling. Id.; see also Exhibit "E." Moreover, Jackson was aware that while working for NYCHA, Mr. Enderlin gained significant experience in conducting financial negotiations with banks and other private-sector financers. Additionally, the New Foundations Program was working on several projects in partnership with NYCHA. The relationship between HPD and NYCHA was just beginning, and Assistant Commissioner Jackson believed that it would be very advantageous for HPD to hire someone for the deputy director position that already had knowledge of the institutional structure of NYCHA as well as good working relationships within that agency. See Jackson Decl at ¶ 11.

41. Assistant Commissioner Jackson invited Mr. Enderlin to interview for the soon-to-be vacant position. In the spring of 2004, Enderlin met with Assistant Commissioner Jackson, New Foundations Director Michal Aronson, who would supervise the new Deputy Director, and Sabrina Washington, the outgoing Deputy Director. Deputy Director Washington is an African-American female, and Director Aronson is a white female over age 40. See Jackson Decl. at ¶ 12. The three agreed Enderlin was uniquely qualified for the job. Id. at ¶ 13.

42. In June 2006, Assistant Commissioner Jackson conveyed to Christopher Allred, then Director of Operations for the Office of Development, that he wished to hire Eric Enderlin for the position of Associate City Planner Level 2. See the Declaration of Christopher Allred, sworn to November 20, 2006 ("Allred Decl.") and annexed to the Fay

Decl. at ¶ 11. At the time Assistant Commissioner Jackson made his decision, he was unaware of plaintiff's interest in the position. See Jackson Decl. at ¶ 16.

43. On June 30, 2004, Director Allred submitted the Personnel Action Request to the Human Resources division of HPD indicating that the Development Unit wished to hire Mr. Enderlin for the position. See Personnel Action Request at Exhibit "F." See also Allred Decl. at ¶ 12.

44. The Personnel Action Request was in fact submitted prior to Director Allred's receipt of plaintiff's resume and cover letter. See Allred Decl. ¶¶ 12, 16.

45. Plaintiff testified that she does not have any reason to believe that Christopher Allred, who is a white male, is biased against African-Americans, women, or persons over 40. See Exhibit "B" at 84:7-15.

46. On or about July 23, 2004, HPD received permission from City's Office of Management and Budget to hire Eric Enderlin for the position Associate City Planner Level 2. See Exhibit "G." His effective date of hire was August 9, 2004. See Exhibit "H." Enderlin, who is a white male, was 38 years old at the time he was hired for the position. See id.

47. Plaintiff testified that her experience and background qualified her for the position of Associate City Planner Level 2. See Exhibit "B" at 88:1-13.

48. While plaintiff's resume shows that she had experience in some of the skills sought for the new position, and that she met the minimum qualifications in the posting, she concedes that she had no experience in city planning and none of the experience in site clearance, design, environmental zoning, or acting as an intergovernmental liaison

11

called for in the job description and inherent in the work of a city planner. See Exhibit "B" at 66:19-70:21; see also Exhibit "C."

49. Allred received 19 resumes in response to the positing for Associate City Planner. See Allred Decl. at ¶ 15. He reviewed each of the resumes and cover letters submitted, but did not see any candidates as qualified for the position as Eric Enderlin. See id. at ¶ 17. He kept the resumes on file in case subsequent openings within HPD matched the qualifications of those interested in the Associate City Planner Level 2 position. Id. He did not forward them on to Assistant Commissioner Jackson for consideration. Id. Eric Enderlin was the only person interviewed for the position. See Jackson Decl. at ¶ 13.

50. Director Allred called plaintiff to discuss potential openings that might fit with her interests and experience, but his message was not returned. See Allred Decl.

### (d) Sinclair's Application for Administrative Project Director M-2.

51. On June 30, 2005, HPD posted a position for the title "Administrative Project Director M-2. See Exhibit "I."

52. The position was essentially a supervisory version of the Associate City Planner Level 2 position. See Declaration of Wendell Waters sworn to November 20, 2006, ("Walters Decl."), annexed to the Fay Decl. at ¶ 11.

53. The posting listed the minimum qualifications as "a baccalaureate degree from an accredited college and four years of experience in one or more of the following areas: community organization, social work, urban development projects, real estate, public administration or a related field, for which two years must have been in a field directly related to neighborhood improvement such as housing, community organization, urban renewal or planning, or real estate. A Law Degree or graduate work in an appropriate field may be substituted for up to two years of the general experience required." See Exhibit "I."

54. The posting directed interested candidates to contact, Nelva Taub, Director of Operations for the Division of Homeownership. See Exhibit "I."

55. On or about July 15, 2005, Eric Enderlin submitted a resume and cover letter expressing interest in the Administrative Project Director M-2 position to Nelva Taub. See Exhibits "J"

56. On or about July 20, 2005, plaintiff submitted a resume and cover letter expressing interest in the Administrative Project Director M-2 position to Nelva Taub. See Exhibit "K."

57. A total of about twenty five people submitted resumes in response to the posting for Administrative Project Director M-2. See Walters Decl at ¶ 7.

58. Wendell Walters, an African-American male, age 48 years old, was the Assistant Commissioner of the Homeownership Division, and was in charge of making the hiring decision with respect to the Administrative Project Director M-2 position. See Walters Decl. at ¶ 12.

59. Assistant Commissioner Walters interviewed nine candidates for the position, including plaintiff and Eric Enderlin. See Waters Decl. at ¶ 8; see also Exhibit "L."

60. On or about August 5, 2005, plaintiff interviewed with Assistant Commissioner Walters. See Exhibit "L." See also Exhibit "B" at 92:7-10. Plaintiff testified that she knew Assistant Commissioner Walters prior to the interview because they also had worked in the same area earlier in their careers at HPD. See id. at 92:11-94:6. She testified that she did not believe that Assistant Commissioner Walters was biased against African-Americans, women, or persons over age 40. See Exhibit "B" at 98:18-99:3.

13

61. On or about August 6, 2005, Eric Enderlin was selected for the position of Administrative Project Director M-2 by Wendell Walters. See Walters Decl. at ¶ 9.

62. Assistant Commissioner Walters stated that in considering who was the best candidate for the position of Administrative Project Director M-2, he felt that Eric Enderlin's background in private development, real estate finance, and financial modeling, as well as his experience with NYCHA, made him a better candidate than plaintiff, whose resume was more geared toward the construction and non-profit side of development. See Walters Decl. at ¶ 9-11.

C. **Plaintiff's Allegations That She was Subjected to a Hostile Work Environment**

63. Plaintiff alleges that she was subjected to a hostile work environment in her complaint. See Exhibit "A" at ¶ 16.

64. In her complaint, plaintiff alleges that the fact that she was not promoted on two separate occasions created a hostile work environment. See Exhibit "A."

65. Plaintiff testified at her deposition, when asked whether she was unhappy with her current position with the Small Buildings Loan program, that she was not unhappy with the position, but was only looking for an opportunity to increase her salary. See Exhibit "B" at 72: 10-13.

D. **Plaintiff's Allegations of Retaliation**

66. Plaintiff asserts that because the grievance she filed in 2001, relating to the reorganization of her division she was retaliated against by not being promoted to Associate City Planner Level 2 and the Administrative Project Manager M-2. Id. at 85:2-86:8.

67. Plaintiff testified at her deposition that she suspects her 2001 grievance and her subsequent placement in a new position was a great annoyance for Annemarie Hendrickson, the Assistant Commissioner of the division in which plaintiff worked in 2001.

See Exhibit "B" at 88:17-89:4. Plaintiff acknowledged that Assistant Commissioner Hendrickson had no involvement in the hiring for either job for which she applied. See Exhibit "B" at 89:6-14.

68. Plaintiff testified at her deposition that her grievance did not include a claim of discrimination on the basis of race or gender. See Exhibit "B" at 86:3-8.

69. Plaintiff also alleges that as a result of the filing of a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in January 2005, defendant retaliated against her by not promoting her to the Administrative Project Manager M-2 position in July 2005.

### E. Plaintiff Files an EEOC Charge and Then Decides to Pursue Her Charge of Discrimination in Federal Court.

70. Plaintiff filed a charge with the EEOC regarding defendant's alleged discriminatory conduct with respect to the Associate City Planner Level 2 position on or about January 26, 2005. See Exhibit "M."

71. Plaintiff included in her EEOC charge a claim that the failure to promote her to the Associate City Planner Level 2 position was in retaliation for a grievance she filed in 2001. See Exhibit "M."

72. On or about October 4, 2005, the EEOC issued a right-to-sue letter to plaintiff. See Exhibit "N."

73. On or about January 5, 2006, plaintiff commenced the instant action.

Dated:   New York, New York
         November 20, 2006

15

                MICHAEL A. CARDOZO
                Corporation Counsel of the
                  City of New York
                *Attorney for Defendants*
                100 Church Street, Room 2-123
                New York, New York 10007
                (212) 788-8699

By: _/s/ Joshua Fay_____
      Joshua Fay (JF 9397)
      Assistant Corporation Counsel

Diana Goell Voigt,
Joshua Fay,
Of counsel.

16

Docket No. 06 Civ. 0141 (WHP)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WANDA SINCLAIR,

                                                Plaintiff,

-against-

THE CITY OF NEW YORK,

                                                Defendant.

**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1**

*MICHAEL A. CARDOZO*
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street, Room 2-123*
*New York, N.Y. 10007*

*Of Counsel: Joshua Fay*
*Tel. No.: (212) 788-8699*